**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**ROBERT F. MERICLE,** *et al.*,

      Plaintiffs,

         v.

**JACKSON NATIONAL LIFE
INSURANCE COMPANY,** *et al.*,

      Defendants.

CIVIL ACTION NO. 3:15-CV-419

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is Defendants Jackson National Life Insurance Company ("Jackson") and PPM Finance, Incorporated's ("PPM") Motion for Summary Judgment. (Doc. 16) Jackson and PPM seek summary judgment on Plaintiffs Robert Mericle and Mericle Development's (collectively "Mericle") claims of breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and negligent misrepresentation. (Exhibit A, Doc. 1-2, Complaint *"Compl."*, 3-12.)[1] Jackson and PPM's motion for summary judgment will be granted in part and denied in part. Because an ambiguity exists in the parties' loan agreements and an issue of material fact remains as to the voluntariness of Mericle's payment of a Prepayment Premium demanded pursuant to one of the parties' agreements, Jackson and PPM's motion for summary judgment will be denied in part. However, because Jackson and PPM are entitled to judgment as a matter of law on Mericle's claims regarding the parties' other loan agreement and on Mericle's unjust enrichment and negligent misrepresentation claims, Jackson and PPM's motion for summary judgment will be granted in part.

---

[1]      Within this memorandum, page number citations are to the pagination assigned by the electronic case filing system, without regard to the parties' assigned page numbers.

**I. Background**

**A.     Factual and Procedural Background**

The following facts are taken from the Complaint and the parties' statements of fact. (Docs. 1-1;18; 26)

Mericle Commercial Real Estate Services was established in 1985 and is a full service commercial real estate company that builds industrial offices and flex buildings in Pennsylvania. (Doc. 18, ¶ 1 (quotations omitted).) In 1987, Mericle Development Company, was founded by Robert Mericle, its CEO and sole shareholder, and is organized under the parent company of Mericle Commercial Real Estate Services. (*Id.* at ¶¶ 2-3.) Funding is essential to Mericle Development's success, so Mr. Mericle devised the following specific financing program for his companies: use conventional commercial lenders for temporary, interim, and construction debt, and when construction is complete and the project stabilizes, pursue a life insurance company lender for permanent debt financing. (*Id.* at ¶¶ 4-5 (quotations omitted).)

In 1995, Mericle engaged Carey Kramer Pettit Panichelli and Associates ("Carey Kramer"), a Pennsylvania mortgage broker, to assist in obtaining financing from a life insurance lender. (*Id.* at ¶ 6.) Mericle chose Jackson, a life insurance company, to provide financing, and PPM, who services loans for companies like Jackson, serviced the loans involved in this case. (*Id.* at ¶ 7;*Compl.,* ¶ 7.) When agreement was reached, a representative of PPM signed the loan documents as an authorized agent for Jackson. (*Compl.* at ¶ 16.)

After Mericle selected Jackson, the parties engaged in substantial negotiations, including negotiating over the term sheet, or loan application, that included the amount and duration of the loan and the prepayment terms. (Doc. 18, ¶¶ 10-11.) Mericle disagrees that the parties negotiated the terms of the prepayment provisions, but instead, that the terms

2

regarding prepayments came from Jackson's form documents. (Doc. 26, ¶¶ 10-12.) Mericle did, however, request and the parties agreed to a one-year "lockout period", or the period during which the loan could not be repaid; despite Jackson's request for a five-year period. (*Id.* at ¶ 14.) Other than the lockout period, Mericle did not request any changes to language providing the method for calculating the Prepayment Premium in the Loan Application. (*Id.* at ¶ 15.) The language included in the Loan Application is virtually identical to the prepayment provision contained in the final versions of the loans currently at issue. (*Id* at ¶ 12.)

Following negotiations, Mr. Mericle conducted his own "material" review of the Loan Application containing the major business terms and Mr. Mericle and Mericle Development were also represented by outside counsel, Lewis Sebia, who was an experienced commercial real estate lawyer. (*Id.* at ¶ 13.) Prior to entering into the Loan Agreements, the loan documents went through serial revisions at the request of Mericle and counsel. (*Id.* at ¶ 16.) Mr. Sebia read the promissory note "carefully."(*Id.*)

On November 5, 1996, Mr. Mericle signed a Loan Agreement with Jackson. (*Compl.*, ¶ 5.) Jackson issued a loan to Mericle in the amount $ 15,890,000 with an eighteen-year (18) term, an interest rate of 8.57 %, and a maturity date of December 1, 2014 (hereinafter "1996 Loan").[2] (Doc. 18, ¶ 20.) On November 20, 1997, the parties entered into another agreement for a $ 10,000,000 loan with a seventeen-year (17) term and a 7.69 % interest rate (hereinafter "1997 Loan"). (*Id.* at ¶ 21.) The 1997 Loan was advanced in two tranches. (*Id.*) Both loan packages contained several loan documents including, among others documents, a "Loan Agreement", a "Promissory Note", and a borrower's counsel letter; and

---

[2]

The 1996 Loan was subsequently amended. On August 20, 2008, Mr. Mericle, on behalf of himself and as President of Mericle Development, signed a "Second Allonge" and amendment to the 1996 Loan.  (Doc. 18, ¶ 51; Doc. 26, ¶ 51; Doc. 21–25.)

both loans were collateralized with several properties in Pennsylvania. (*Id.* at ¶¶ 22-23.) Mr. Mericle signed the loan documents on behalf of himself and Mericle Development. (*Id.* at ¶ 24.) When executing the Promissory Note, Mr. Mericle and Mericle Development represented that both were "knowledgeable in business matters" and, there was language, specifically in the Confession of Judgment clause, stating that the terms of the loan were "negotiated and agreed upon in a commercial context." (*Id.* at ¶ 25.)

Pursuant to the Loan Agreement, Jackson was permitted to assign[3] the 1996 Loan. Mericle, as the borrower, had "no right to make prepayments of the Loan in whole or in part except in accordance with the terms of the [Promissory] Note." (*Id.* at ¶¶ 26, 30.) The Prepayment Provision in the promissory notes is as follows:

> 9.  <u>Prepayment.</u> This Note may not be prepaid for one year. Thereafter, Maker may prepay the Note in whole or in part upon payment of a prepayment premium equal to the greater of (1) 1 % of the prepaid amount and (ii) an amount calculated at the time of prepayment using a formula designed to compensate the Noteholder for the loss of the performing Loan. This yield protection payment will be calculated by (a) assuming reinvestment of the prepaid amount in U.S. Treasury Securities with maturities as close as practicable to the Maturity Date, (b) assuming conversion of this Note to a bond-equivalent, interest-only note without changing its interest rate, and ( c) determining the present value of the difference between the two assumed interest-payment streams, using the yield of the assumed reinvestment as the discount rate. Maker may prepay the Loan at par during the ninety-day period preceding the Maturity Date. No prepayment premium will be charged on amounts attributable to insurance or condemnation proceeds applied to reduce the principal balance of the Loan. . .

(*Id.* at ¶ 31.)

Carey Kramer was retained by Jackson and PPM and served as the mortgage

---

[3]

> 6.1.  <u>Lender's Rights to Assign.</u> Lender shall have the right to assign, transfer, sell, negotiate, pledge or otherwise hypothecate this Agreement and any of its rights and security hereunder, including the Note, Mortgage, and any other Loan Documents. Borrower hereby agrees that all of the rights and remedies of Lender in connection with the interest so assigned shall be enforceable by Lender but for such assignment. Borrower agrees that Lender shall have the right to sell participations in the Loan or to include the Note in a securitized pool of indebtedness without the consent of Borrower.

correspondent for the both loans. (*Id.* at ¶¶ 33, 35; Doc. 26, ¶ 33.)[4] Carey Kramer collected payments from Mericle, processed Mericle's requests (including requests for prepayment), calculated prepayment premiums, collected prepayment premiums, and served as an overall intermediary between the Mericle and Jackson and PPM. (Doc. 18, ¶ 34; Doc. 26, ¶ 34.)

On January 30, 2001, Jackson sold the 1996 Loan to Wells Fargo Bank Minnesota, N.A., as trustee for Morgan Stanley Dean Witter Capital I, Inc., Commercial Mortgage Pass-Through Certificates, Series 2001-PPM (hereinafter the "Trust"). (*Id.* at ¶ 36.) The 1996 Loan was then securitized pursuant to a Pooling and Servicing Agreement. (*Id.* at ¶ 37.) Despite the sale, the party who had control over the 1996 Loan following securitization is disputed; Jackson and PPM assert the securitized loan was controlled by the Master Servicer at the time; but, Mericle contends that PPM, as the Special Servicer, retained the right to service the 1996 Loan after it was securitized. (*Id.* at ¶ 38; Doc. 26, ¶ 38.) The parties also dispute who Carey Kramer communicated with when Mericle contemplated paying off the 1996 Loan and whether the Master Servicer or PPM made the final calculation. (Doc. 18 at ¶ ¶ 39, 41; Doc. 26, ¶¶ 39, 41.)

In 2005, Mericle prepaid a portion of the 1996 Loan. (Doc. 18, ¶ 40; Doc. 26, ¶ 40.) At the time, Carey Kramer contested the calculated Prepayment Premium by communicating with the Master Servicer, challenging the fact that the calculation did not take amortization into account, but the Master Servicer denied the request to recalculate the Prepayment Penalty. (Doc. 18, ¶¶ 45-46; Doc. 26, ¶¶ 45-46.) Mericle paid a Prepayment

---

[4]

Jackson states that Carey Kramer served as its intermediary on the 1996 Loan until the loan was sold in 2001. (Doc. 18, ¶¶ 34-35.) Mericle contends that Carey Kramer continued to deal with PPM and PPM continued to instruct Carey Kramer with respect the 1996 Loan and cites to PPM's role as "Special Servicer" after the loan was securitized as evidence of PPM's continued involvement. (Doc. 26, ¶ 33; *See* Doc. 21-18, 52; 157-193.)

Premium in 2005. (Doc. 26, ¶ 46.) Mericle paid the following additional Prepayment Premiums: in 2006, in the amount of $ 16,988.71; in 2007, in the amount of $ 147,404.12; and, in 2008, in the amount of $ 156,270.16. (Doc. 18, ¶¶ 47-50.) Mericle paid the premiums and did not file suit because the amount paid was not sufficiently large enough to cause it to file suit. (Doc. 26, ¶¶ 47-50.)

In 2011, Mericle prepaid the loans in their entirety in order to use the 1996 and 1997 Loan collateral properties as substitute collateral for a multi-million dollar financing arrangement with another life insurance lender. (Doc. 18, ¶¶ 53-54; Doc. 26, ¶¶ 53-54.) Upon request of Mericle, Carey Kramer calculated the Prepayment Premium for the 1997 Loan and the calculation was confirmed by Karl Hildebrand, the loan administrator for PPM Finance. (Doc. 18, ¶¶ 55; Doc. 26, ¶ 55; Doc. 20, ¶ 1, 7-8.) The Master Servicer calculated the Prepayment Premium for the 1996 Loan. (Doc. 18, ¶ 56; Doc. 26, ¶ 56.)[5] Neither calculation took amortization into account. (Doc. 18, ¶¶ 55-56; Doc. 26, ¶¶ 55-56.) Mericle paid the calculated Prepayment Premiums under protest. (Doc. 18, ¶ 57; Doc. 26, ¶ 57.)

On February 2, 2015, Mericle filed a complaint in the Luzerne County Court of Common Pleas comprised of the following four (4) counts: Count I, Breach of Contract; Count II, Breach of the Duty of Good Faith and Fair Dealing; Count III, Unjust Enrichment; and, Count IV, Negligent Misrepresentation.  (*Compl.,* Doc. 1-2.) Mericle seeks the alleged amount overpaid as Prepayment Premiums as well as prejudgment interest. (Doc. 18, ¶ 58; Doc. 26, ¶ 58; *Compl.,* Doc. 1-2.) On February 26, 2015, Jackson and PPM  sought to have

---

[5]

Mericle's response to the Jackson and PPM's statement of fact is as follows:"Admitted only that Jackson National and PPM have refused to take amortization into account when calculating prepayment premiums. As set forth more fully in Mericle's brief, they are wrong to refuse to do so." (Doc. 26, ¶ 56.) In its brief and supporting documents, Mericle acknowledges that the Master Servicer at the time of the prepayments at issue, calculated the Prepayment Premium for the 1996 Loan. (*See* Doc. 25-1, 20; Doc. 21-27; Doc. 25-7, 3-6.)

the case removed to this court pursuant to 28 U.S.C. 1446. (Doc. 1) On March 26, 2015, Jackson and PPM  filed an answer to Mericle's complaint, asserting affirmative defenses. (Doc. 8.) On November 13, 2015,  Jackson and PPM filed a motion for summary judgment (Doc. 16), a brief in support (Doc. 17), and a statement of facts (Doc. 18). On December 7, 2015, Mericle filed a brief in opposition to the motion for summary judgment (Doc. 25) and a responsive statement of facts (Doc. 26). On December 22, 2015,  Jackson and PPM filed a reply brief. (Doc. 27) The motion for summary judgment is now ripe for disposition.

### B.   Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material

fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

This case is before me as a diversity action pursuant to 28 U.S.C. § 1332. "A federal court sitting in diversity must apply state substantive law and federal procedural law." *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262 (3d Cir. 2011) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The parties appear to agree that Pennsylvania substantive law is to be applied to the current case.[6]

## II. Discussion

The current case involves a dispute over the proper calculation of Prepayment Premiums resulting from the parties' differing interpretations of the calculation formula contained in the parties' Loan Agreements. (Doc. 18, ¶¶ 43-44;  Doc. 26, ¶¶ 43-44.) Jackson and PPM move for summary judgment on all of Mericle's claims. (Docs. 16-17.)

### A.    Breach of Contract

#### 1.    1996 Loan

Jackson and PPM contend that neither can be liable for the amounts paid on the 1996 Loan because the 1996 Loan was assigned in 2001 and neither was a party to the loan when the prepayments at issue were made. (Doc. 17, 28.) Mericle counters that "[f]actual issues preclude the entry of [summary judgment]" (Doc. 25-1, 19.)

The "three elements . . .  necessary to plead a cause of action for breach of contract: [are] (1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*,--- A. 3d ----, 2016 WL 1627551, at *9 (Pa. Apr. 25, 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp. Inc.,* 792 A.2d 1269, 1272 (Pa.Super.2002)). It follows that "[i]f one is not a party to the contract, one cannot breach it." *Electron Energy Corp. v. Short*, 408 Pa. Super. 563, 571, 597 A.2d 175, 179 (1991), aff'd, 533 Pa. 66, 618 A.2d 395 (1993). Under Pennsylvania law, a party may assign a contract and "[a]n assignment is a transfer of property or a right from one person to another;

---

[6]

The parties' agreements purportedly states that Pennsylvania law would govern. (*Compl.*, Doc. 1-2 ¶ 14; Doc. 1-2, 39; 80.)

unless qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." *Crawford Cent. Sch. Dist. v. Com.*, 585 Pa. 131, 136-37, 888 A.2d 616, 619 (2005) (citing *Legal Capital, LLC. v. Medical Professional Liability Catastrophe Loss Fund,* 561 Pa. 336, 750 A.2d 299, 302 (2000)). The "assignee [then] stands in the shoes of the assignor." *Crawford*, 585 Pa. at 136-37, 888 A.2d at 619 (citing *Hedlund Manufacturing Company, Inc. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357, 358 (1988)).

Jackson was permitted to assign the 1996 Loan pursuant to the parties' agreement, *see supra* note 3, and Mericle admits that Jackson had the right to assign the 1996 Loan. (Doc. 18, ¶ 26; Doc. 26, ¶ 26.) Pursuant to that right, a Bill of Sale was executed between Jackson and Morgan Stanley Dean Witter Capital I Inc. ("Morgan Stanley") on January 30, 2001 (Doc. 19-1.). The 1996 Loan was among the mortgages securitized, meaning it was pooled with a number of loans and sold as a loan pool. (Doc. 25-15, 12; Doc. 19-2, 27; *see also* Doc. 21-18.) The accompanying "Mortgage Loan Purchase Agreement" between Jackson and Morgan Stanley stated that "[u]pon the sale of the Mortgage Loans by the Seller to the Purchaser pursuant to this Agreement, the ownership of each Mortgage Note, Mortgage and other contents of the related Mortgage File shall be vested in the Purchaser and its assigns,. . ." (Doc. 19-2, 7.)

There is no dispute that the 1996 Loan was securitized in 2001. (Doc. 18, ¶ 36; Doc. 26, ¶ 36.) In its briefs in opposition Mericle fails to specifically address whether Jackson is liable with regard to the 1996 Loan, however, it is clear that all Prepayment Premiums were paid by Mericle after 2001 when Jackson was no longer a party to the 1996 Loan. Additionally, the evidence of record is that Mericle signed a Second Allonge on August 20, 2008, that amended the 1996 Loan. (Doc. 21-25, 2-5.) This agreement was between Mericle and Wells Fargo Bank, N.A., and executed by the Master Servicer at the time, Capmark Finance, Inc. (*Id.* at 4-5.) Mericle also entered into a Third Amendment to the 1996 Loan; which again was between Mericle and Wells Fargo Bank, N.A., and executed by the Master Servicer. (Doc. 21-26, 2-5.) Clearly, all of Jackson's rights were

extinguished upon assignment of the 1996 Loan and it could no longer be liable for breach of contract with regard to the 1996 Loan.

Turning to PPM, the parties agree PPM was the Special Servicer to the loans in the securitized pool (Doc. 25-1, 19; *see also* Doc. 21-18, 52 ("**Special Servicer** means PPM Finance, Inc. or any successor Special Servicer as herein provided.")). The parties disagree about whether PPM's role leads to possible liability under the 1996 Loan. Mericle contends that Jackson and PPM can be liable for the alleged overcharge on the 1996 Loan because, after securitization, PPM, as Special Servicer, "had the ability and authority to take any actions that the Master Service [sic] could take with respect to all loans" and "repeatedly exercised this power with respect to the prepayment of the 1996 loan after the loan was securitized." (Doc. 25-1, 19.) Mericle also contends that because PPM answered Carey Kramer inquiries about Prepayment Premiums in 2005 and 2008, summary judgment is inappropriate with regard to the 1996 Loan. (*Id.* at 19-20.) Additionally, Mericle argues that the following facts demonstrate there is dispute that precludes summary judgment: PPM objected to the release of tax escrow moneys, which caused Carey Kramer to hold up the release of the escrowed funds for the securitized and unsecuritized loans; and, because Prepayment Premiums were wired to Carey Kramer and PPM, PPM may have received a portion of the funds. (*Id.* at 20.) Jackson and PPM argue in reply that PPM cannot be liable under the 1996 Loan simply because PPM was the special servicer. (Doc. 27,12-13.)

Although neither party directly addresses the issue of whether PPM was a party to the loans, Mericle describes the relationship between Jackson and PPM as follows:

> Technically, Jackson National was the lender and PPM was the agent in charge of making commercial real estate loans for Jackson National. See Hildebrand dep. at 7-8; Rodes dep. at 7-8. Jackson National and PPM had common ownership, see Rodes dep. at 7, and PPM only worked for Jackson National and a Jackson National subsidiary. See Maraffino dep. at 22. Jackson National was never involved in the lending decisions. See Hildebrand dep. at 7-8; Rodes dep. at 15-17. As a result, PPM often referred to itself and Jackson National interchangeably. See Exhibit 8; Hildebrand dep. at 59-60; Rodes dep. at 79-81. For these reasons, there is no practical distinction between Jackson National and PPM in this lawsuit.

(Doc. 25-1, 3 n. 7.) Failing to distinguish between Jackson and PPM does not necessarily

demonstrate that the companies are one entity. The Loan Documents, as attached to Mericle's complaint, for both the 1996 and 1997 Loans, are entitled "Loan Agreement by and between Jackson National Life Insurance Company, as Lender, and Robert K. Mericle and Mericle Development Corp., as Borrower." (Doc. 1-2, 14-86; *See also Compl.* at ¶ 5.)(Doc. 1-2, 43.) These documents further state that PPM is an authorized agent of Jackson, and signed the documents pursuant to that agency relationship.

Pennsylvania "[a]gency principles maintain that if an agent enters into a contract on behalf of a disclosed principal, the agent does not become a party to the contract", and "in the absence of circumstances showing that personal responsibility was incurred, [the agent] is not personally liable to the other contracting party." *Poulos v. Nicolaides*, 241 F. App'x 25, 27 (3d Cir. 2007) (citing *Publicker Indus., Inc. v. Roman Ceramics Corp.,* 652 F.2d 340, 343 (3d Cir.1981); *Viso v. Werner,* 471 Pa. 42, 369 A.2d 1185, 1187 (1977)). Additionally, when addressing a breach of contract claim, there is a "distinction between a 'loan servicer". . .and a "lender' and/or 'note holder'" because "[t]he 'servicing' of a mortgage, i.e. the right to collect payments from the mortgagor, exists as a separate right that can be transferred independently of other provisions in the mortgage or note." *Trunzo v. Citi Mortgage*, 876 F. Supp. 2d 521, 532 (W.D. Pa. 2012) on reargument in part, 43 F. Supp. 3d 517 (W.D. Pa. 2014) (citing *In re Am. Mortg. Holdings, Inc.,* 637 F. 3d 246, 259-260 (3d Cir. 2011)).

There is no dispute of material fact with regard to whether PPM was a party to the 1996 Loan. PPM may have played a role in the discussions surrounding the calculation of the Prepayment Premiums after the 1996 Loan was sold to Morgan Stanley, but it was not a party to the mortgage. Jackson was the disclosed principal and there has been no argument advanced that PPM incurred responsibility under the 1996 Loan. After 2001, PPM was simply acting as an intermediary under the terms of the Pooling and Serving Agreement as Special Servicer. *See Ruff. v. America's Servicing Co.*, 2008 WL 1830182 * 4 (W.D. Pa. Apr. 23, 2008) (defendant servicer who was not party to a mortgage cannot be liable for breach of contract). Further, Mericle's contention that Jackson and PPM are one in the same logically leads to the conclusion that neither Jackson and PPM cna be

liable with regard to the 1996 Loan because the loan was assigned as agreed to by Mericle.

Mericle's arguments that PPM should be liable on the 1996 Loan because Carey Kramer decided to hold tax escrow sums based on PPM's objection regarding the 1997 Loan[7] and because PPM may have received some of portion of the Prepayment Penalty[8] are unavailing.

There is no dispute of material fact regarding the existence of a contract for the 1996 Loan between Jackson and Mericle or between PPM and Mericle at the time the Prepayment Premiums were paid. Therefore, Mericle cannot state a breach of contract claim.  Jackson and PPM are entitled to summary judgment on Mericle's claims for breach of contract regarding the 1996 Loan.

## 2.     1997 Loan[9]

Mericle alleges that the Loan Documents were breached when Jackson and PPM "calculat[ed] and demand[ed] an improper and excessive Prepayment Premium." (*Compl.,* at ¶ 42.)  The basis for Mericle's claim is its contention that the Note, and more specifically,

---

[7]

The supporting evidence that Mericle cites states the contrary by demonstrating that Carey Kramer stopped the release of tax escrow moneys on the 1996 Loan on its own initiative. (Doc. 25-14, 28 ("And the reason that Carey Kramer had interrupted its normal process of releasing the Berkadia [1996 Loan] tax escrow is because PPM had objected to the release of its escrow and Carey Kramer was waiting to hear from Berkadia to see if they would also object.")

[8]

Mericle contends that because PPM witnesses were unable to state whether PPM received any part of the prepayment premiums for the 1996 loan, a dispute of fact remains. (Doc. 25-1, 20 n. 27.) Mericle cites to the following deposition testimony in support:

Q. Do you know who received the prepayment premium for the 1996 loan?
A. No.
Q. Was it PPM?
A. I have no idea. It's a securitized loan. I'm assuming Berkadia received it.
(Doc. 25-19, 13.)

[9]

As with the 1996 Loan, no party specifically addresses whether both Jackson and PPM are parties to the 1997 Loan.

the Prepayment Premium language, is ambiguous and/or inconsistent. (*Id.* at ¶ 28.) Mericle alleges "trade usage, custom and practice require that amortization be taken into account when calculating a prepayment premium," but amortization was not taken into account when the Prepayment Premiums at issue in this case were calculated. (*Id.* at ¶ 30.) Jackson and PPM seek summary judgment and argue that Mericle's breach of contract claim must fail because the Prepayment Premiums were calculated in accordance with the unambiguous language of the Note, and therefore, the contract was not breached. (Docs. 16-17.)

As noted above, under Pennsylvania law, the "three elements . . .  necessary to plead a cause of action for breach of contract: [are] (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C.*, 2016 WL 1627551, at *9 (citing *J.F. Walker*, 792 A.2d at 1272). There is no dispute that there were two contracts between the parties, however, only the language of the 1997 Loan remains at issue. *See* Section A(1) *supra*. The issue is whether Jackson and PPM breached the contract with regard to the 1997 Loan when calculating the Prepayment Premium.

Under Pennsylvania contract law, it is a "firmly settled" point that "the intent of the parties to a written contract is contained in the writing itself." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (citing *Krizovensky v. Krizovensky*, 425 Pa. Super. 204, 212, 624 A.2d 638, 642 (1993)). "[A]s a preliminary matter, courts must determine as a matter of law which category written contract terms fall into—clear or ambiguous." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 613 (3d Cir.1995)). Unambiguous language is to be interpreted by the court, while the interpretation of ambiguous language is to be left to the finder of fact.[10] *Kripp v. Kripp*, 578 Pa. 82, 91, 849 A.2d 1159, 1163 (2004). The Third Circuit, has stated that, under Pennsylvania law,

---

[10]

There has not been a jury demand in this case.

because it is presumed that the writing conveys the intent of the parties:

> [a contract] will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Bohler-Uddeholm*, 247 F.3d at 93 (citations omitted). Contracts must be read to avoid ambiguities if possible, *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 247 (3d Cir. 2008) (citing *Masters v. Celina Mut. Ins. Co.,* 224 A.2d 774, 209 Pa.Super. 111, 115 (1966)), and "specific provisions ordinarily control more general provisions." *Great Am. Ins. Co.*, 544 F.3d at 247 (citing *In re Alloy Mfg. Co. Employees Trust,* 411 Pa. 492, 192 A.2d 394, 396 (1963)).

"To determine whether ambiguity exists in a contract, the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). A court must then "decide whether there are objective indications that the terms of the contract are subject to differing meanings."*Krizovensky*, 425 Pa. Super. at 212, 624 A.2d at 643 (citing *Z & L Lumber Co. of Atlasburg v. Nordquist,* 348 Pa.Super. 580, 585-86, 502 A.2d 697, 700 (1985)).

"Ambiguity in a contract can be either patent or latent. While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Bohler-Uddeholm*, 247 F.3d at 93 (citing *Duquesne Light,* 66 F.3d at 614; *Easton v. Washington County Ins. Co.,* 391 Pa. 28, 137 A.2d 332 (1957)). Pennsylvania law permits the introduction of some extrinsic evidence "when a court is faced with a contract containing facially unambiguous

language," to prove a latent ambiguity. *Bohler-Uddeholm*, 247 F.3d at 94 (citations omitted). "[A] party offers the right type of extrinsic evidence for establishing latent ambiguity if the evidence can be used to support 'a reasonable alternative semantic reference' for specific terms contained in the contract," *Id.* at  94 n. 3 (citing *Mellon Bank,* 619 F.2d at 1012 n. 13), or in other words, the court must ask "whether the proffered extrinsic evidence is about the parties' objectively manifested 'linguistic reference' regarding the terms of the contract, or is instead merely about their expectations." *Bohler-Uddeholm*, 247 F.3d at 94 n.3 (citing *Duquesne Light,* 66 F.3d at 614). The introduction  of extrinsic evidence is controlled by the following principles:

> (1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.

*Id.* at 94-95. Further, extrinsic evidence can be used "to support an alternative interpretation of a term that sharpen[s] its meaning" but not for "an interpretation that completely change[s] the meaning", for example, "'extrinsic evidence may be used to show that 'Ten Dollars paid on January 5, 1980,' meant ten Canadian dollars, but it would not be allowed to show the parties meant twenty dollars.'" *Id.* at 112 n. 4(citing *Mellon Bank*, 619 F. 2d at 1013.))

Courts "may also consider extrinsic evidence of a term's recognized trade usage, whether or not that term is ambiguous, where the term is used in a commercial contract." *Artesian Water Co. v. Chester Water Auth.*, 2012 WL 3029689, at *4 (E.D. Pa. July 24, 2012) "Trade usage has been defined to mean 'having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to [a particular agreement].'"*Artesian Water Co. v. Chester Water Auth.*,2012 WL 3029689, at *4 (E.D. Pa. July 24, 2012) (citing *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.,* 2011 WL 204619, at *8 (E.D.Pa. Jan.20, 2011); Restatement (Second) of Contracts § 222(1); 13 Pa. Cons.Stat. § 1303( c)).

A "court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'" *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 164 (3d Cir.2001) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir.1999)).

## A.    Ambiguity

Mericle alleges Jackson and PPM demanded an excessive Prepayment Premium due to the use of an improper calculation that did not take into consideration that the loan was amortizing, or that it had a declining principal balance. (*Compl.* at ¶¶ 12, 24-26.) In other words, when the calculation was performed, the principal amount of the Note, instead of the balance remaining on the Note, was used in the calculation. Mericle alleges that if the 1997 loan was paid through maturity, as originally agreed, the total amount of interest paid would have amounted to $ 484,150.98. (Doc. 25-1, 11.) When prepayment was made and the balance of the loan was paid in full, Mericle alleges that Jackson and PPM demanded a Prepayment Premium amount of $ 683,400.88 leading to an overpayment of $ 208,950.03 (not taking present value into consideration). (*Id.*) In moving for summary judgment, Jackson and PPM contend there is no ambiguity in the contract language and the Prepayment Premium was calculated accordingly, because the calculation "is clear and does not consider that the loans were amortizing." (Doc. 17,  24, 28.)

In order to interpret the parties' agreement to determine if the contract was breached, I must start with the language of the agreement itself. The language at the center of the parties' dispute is as follows:

> Maker may prepay the Note in whole or in part upon payment of a prepayment premium equal to the greater of (i) 1 % of the prepaid amount and (ii) an amount calculated at the time of prepayment using a formula designed to compensate the Noteholder for the loss of the performing Loan. This yield protection payment will be calculated by (a) assuming reinvestment of the prepaid amount in U.S. Treasury Securities with maturities as close as practicable to the Maturity Date, (b) assuming conversion of this Note to a bond-equivalent, interest-only note without changing its interest rate, and ( c) determining the present value of the difference between the two assumed interest-payment streams, using the yield of the assumed reinvestment as the discount rate.

(*Compl.* at ¶ 23.) (emphasis added)

The interpretation of clause (a) is not in dispute. According to Jackson and PPM, clause (a) directs the individual doing the calculation to look to "U.S. Treasury Securities commonly published in *The Wall Street Journal*" and "assume reinvestment of the remaining balance of the loan" in U.S. Treasury securities with a maturity date as close as possible to the maturity date of the loan. (Doc. 17, 24.) The import of clause ( c) is also not disputed. Jackson and PPM contend clause ( c) provides the calculation for determining the present value of the lost income stream or, "[i]n other words, how much do we need today in order to equate the original investment rate, . . .the rate on the note at the time of maturity, if we were to reinvest in those treasury bills." (Doc. 17, 26 (citing Doc. 21-31, 5.).) Mericle does not contest Jackson and PPM's assertion. (*See generally* Doc. 25-1, 14-17.)

The dispute lies in the parties' differing interpretations of clause (b), which states: "assuming conversion of this Note to a bond-equivalent, interest-only note without changing its interest rate." Jackson and PPM offer that "because the loans were paid on an amortizing basis, the Note instructs the reader to convert the Note to a note or debt that is interest-only (i.e., not principal)," and that the term "interest-only" could only mean a "conversion of the loan to a debt that did not consider amortization." (*Id.* at 24-25.) Further, Jackson and PPM assert that the "the bond-equivalent qualification of 'interest-only' note" addresses the fact that bonds are paid on a semi-annual basis, and loans are paid monthly, so the loan must be converted to an "interest-only" note in order to compare interest rates. (*Id.* at 25-26 (citing Doc. 21-6, 5.).)

Mericle's view differs. Mericle argues that "because the loans were amortizing, the calculation had to take amortization into account." (Doc. 25-1, 7.) Mericle contends Jackson and PPM ignore the terms "equivalent," "yield protection" and "designed to compensate Noteholder for the loss of its performing loan", when calculating the Prepayment Premium. (*Id.* at 14-15.) According to Mericle, without taking amortization into account, the calculation does not produce an accurate amount for "the difference between the interest the lenders

18

would have received if Mericle had made the remaining 46 payments" compared to "the interest they [sic] would receive if they invested the prepaid amounts in U.S. Treasury Securities." (*Id.*) Mericle further argues that if the "prepayment calculation ignored amortization . . ., it would not be 'equivalent'" (*Id.* at 7.); that Mericle's interpretation "comports with the purpose of the prepayment premiums," industry standards, and "avoids the absurd and unreasonable' result of giving the lenders a $ 1 million windfall" (*Id.* at 15-16.); and that the "language cannot justify the lenders receiving more money than they [sic] would have received if the remaining monthly payments had been made."(*Id.* at 17.) Alternatively, Mericle contends that the language, if nothing else, is obscure, and because it has provided a purportedly reasonable alternative interpretation, summary judgment should be denied. (*Id.*)

First, I must decide if the language is ambiguous. Mericle's argument in opposition to Jackson and PPM's motion appears to assert, without specifically stating, that a latent ambiguity exists. In determining if a latent ambiguity exists I may consider ,"[t]he objective, extrinsic evidence proffered . . .[of] 'the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.'" *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) (citing *In re New Valley Corp.,* 89 F.3d 143, 150 (3d Cir. 1996); *Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir.1993)). But, I also "must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract." *Bohler-Uddeholm*, 247 F.3d at 96(citations omitted). Proper "[e]xtrinsic evidence notwithstanding, 'the parties remain bound by the appropriate objective definition of the words they use to express their intent.'" *Baldwin*, 636 F.3d at 76 (citing *Mellon Bank,* 619 F.2d at 1013.) And, as set forth in *Bohler-Uddeholm:*

> a claim of latent ambiguity must be based on a "contractual hook": the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face. In other words, the ambiguity inquiry must be about the parties'

"linguistic reference" rather than about their expectations.

*Bohler-Uddeholm,* 247 F.3d at 96 (citations omitted). Further,

> a proffered alternative meaning for the contractual hook must be reasonable; that is, it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning, and the interpretation cannot contradict the standard meaning of a term when the parties could have easily used another term to convey this contradictory meaning.

(*Id.*) "[A] court can [also] consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome." *Bohler-Uddeholm*, 247 F.3d at 96 (citations omitted)

The complaint alleges that the 1997 loan was an amortizing loan, meaning "in addition to paying interest, each monthly loan payment reduced the outstanding principal balance of the loan." (*Compl.* at ¶ 12.) The 1997 Loan[11] documents, attached to Mericle's complaint and brief in opposition, define the "Note" as follows: "Note: The mortgage note described in Section 2.2 of this Agreement, as originally executed or as may be hereafter supplemented or amended from time to time in writing." (Doc. 1-2, 61.) The terms of the loan further describe the "Note" as "(a) A mortgage note ("Note") from Borrower payable to the order of Lender in the original principal amount of Two Million Two Hundred Forty Thousand Dollars ($ 2,240,000.00)". (Doc. 1-2, 62.) There was, however, an Allonge that was executed on March 2, 1998, that was attached and made a part of the November 20, 1997 Promissory Note, and advanced a second tranche, increasing the 1997 Loan principal amount to ten million dollars ($ 10,000,000.00). (Doc. 25-4, 29.)

The word "Note" in the Prepayment Premium formula is the contractual hook in this case. Although the term, in and of itself, seems unambiguous, in light of the parties' presentations, a latent ambiguity exists.

---

[11]

Under Pennsylvania law, "a court should look to the contract as a whole for guidance in interpreting a term in the contract." *Bohler-Uddeholm*, 247 F.3d at 97(citing *Duquesne Light,* 66 F. 3d at 615)).

The amount to be assigned to "Note" at the time the prepayment calculation is made is reasonably susceptible to two alternative meanings: it can denote that the amount is the principal amount of the Note on the date the loan was originated; or, it could be the principal balance remaining on the Note on the date that a prepayment is made. As Mericle states, and Jackson and PPM do not specifically challenge, the amount of money that Jackson and PPM would have received if the 1997 Loan was paid to maturity differs from what was demanded at the time of the prepayment. In light of the language proceeding the formula for calculation that the Prepayment Premium was "designed to compensate the Noteholder for the loss of the performing Loan", and because the performing loan was an amortizing loan, the term "Note" is ambiguous. Both parties have put forward "'a reasonable alternative semantic reference' for specific term[] contained in the contract", *i.e.* the term "Note", therefore, summary judgment is not appropriate based on contract interpretation as it is to be left to the "fact-finder to decide . . .[the] meaning" of ambiguous language. *Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) (citations omitted).

## B.    Voluntary Payment Doctrine

Notwithstanding the foregoing discussion, Jackson and PPM contend, that regardless of any alleged ambiguous language, Mericle's claims are barred by the voluntary payment doctrine because Mericle freely chose to pay off the loans in 2011. (Doc. 17, 29-30.)  Jackson and PPM also argue that the fact that the Prepayment Premium was paid under protest "is of no moment," and that there is no dispute regarding Mericle's awareness of how the Prepayment Premiums were calculated. (*Id.* at 30.) In opposition, Mericle contends that the voluntary payment doctrine is inapplicable for two reasons: first, there is a dispute of fact regarding whether Mericle's payment was voluntary; and, second, because Mericle made the payment under protest. (Doc. 25-1, 18.)

Under Pennsylvania law, "the voluntary payment defense provides that '[w]here, under a mistake of law, one voluntarily and without fraud or duress pays money to another with full knowledge of the facts, the money paid cannot be recovered.'" *Liss & Marion, P.C.*

*v. Recordex Acquisition Corp.*, 2007 PA Super 351, ¶ 24, 937 A.2d 503, 514 (2007), aff'd, 603 Pa. 198, 983 A.2d 652 (2009) (citing *Acme Markets, Inc. v. Valley View Shopping Center, Inc.,* 342 Pa.Super. 567, 493 A.2d 736, 737 (1985)*; Ochiuto v. Prudential Insurance Co. of America*, 356 Pa. 382, 384, 52 A.2d 228, 230 (1947)). Pennsylvania cases have long recognized that:

> Money voluntarily paid under a claim of right where there has been no mistake of fact cannot be recovered back; nor does the fact that the money is paid under protest, of itself, give a right to recover the sums so paid. The payment must have been made under compulsion to prevent the immediate seizure of goods or the arrest of the person.

*Union Ins. Co. v. City of Allegheny*, 101 Pa. 250, 250 (1882). Therefore, with regard to this case, fraud or duress are necessary prerequisites to the inapplicability of the voluntary payment doctrine.

"Under Pennsylvania law, duress generally is 'that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.'"*Abrevaya v. VW Credit Leasing, Ltd.*, 2009 WL 8466868, at *2 (E.D. Pa. July 22, 2009) (citing *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519, 521 (Pa.1967)). There can also be economic duress under Pennsylvania law. "Economic duress, *i.e.,* business or economic compulsion, is a form of duress" and has been defined as follows:

> To constitute duress or business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced fears a loss of business unless he does so enter into the contract as demanded.

*McDonald v. Whitewater Challengers, Inc.*, 2015 PA Super 104, 116 A.3d 99, 114-15 (2015) (citing *Tri–State Roofing Co. of Uniontown v. Simon,* 187 Pa.Super. 17,  20-21, 142 A.2d 333, 335 (1958)). "Such coercion must be great enough to overcome the complaining party's free will." *Abrevaya*, 2009 WL 8466868, at *3 (citing *Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp.,* 243 Pa.Super. 101, 364 A.2d 470, 476 (Pa.Super.Ct.1976).

Mericle argues that the voluntary payment doctrine is inapplicable because, if the Prepayment Premiums were not paid, Jackson and PPM "refused to release liens, and . . .the failure to release those liens would derail a multi-million dollar transaction." (Doc. 25-1, 18.) In support Mericle contends:

> Jackson National and PPM refused to release their liens until and unless Mericle paid literally every dollar they demanded. See Exhibit 20. Indeed, Jackson National and PPM demanded even more, and wanted Mericle to agree that it would not challenge the amounts demanded. See Exhibit 20. Given that Mericle needed to release the liens to complete a multi-million dollar financing that was taking place on the same day, see Mericle dep. At 113-16[12].; Sebia dep. At 77-82[13], there is at minimum a factual question as to whether the payments were voluntary.

(Doc. 25-1, 18 n. 25.)[14] The potential derailment of the pending deal purportedly made the payments involuntary.

Jackson and PPM argue it was Mericle's choice to prepay the loans in order to take advantage of low interest rates, therefore, the payments could not have been involuntarily made. (Doc. 27, 13.) Jackson and PPM also challenge Mericle's contention that the

---

[12]

Mr. Mericle's cited testimony is:
Q: And you made this multi-hundred-million-dollar financing deal with ING on or around the time that you paid the prepayment premium on the two loans, . . . ?
A: I'm not sure of this, but I think it was the same day. So the answer is yes, but I don't —it's within days.
(Doc. 25-17, 31.)

[13]

Mr. Sebia's testimony is:
Q: Was there any need to prepay these loans by a particular date that was part of the business strategy involved here?
A: It was part — the prepayment of these loans were part of a broader transaction, so, yes. The answer would be yes to the extent that that was a date under the broader transaction.
Q: And had the broader transaction been arranged before you asked for the prepayment calculations on the '96 and '97 loans?
A: I don't recall specifically, but I believe it was ongoing when we first asked.
(Doc. 25-20, 24-25.)

[14]

The discussions regarding the release of the liens is evidenced by an email chain attached to the filings. (See Doc. 25-5, 30-46.)

payments were involuntarily made based on an alleged refusal on the part of Jackson and

PPM to release the liens. In support, Jackson and PPM cite the following time line:

> 1/13/2011: Mericle first requested a payoff on the 1997 Loan from PPM *on the 1997 Loan* only;
> 2/16/2011: Mericle protests the Prepayment Premium on the 1997 Loan for the first time;
> 2/16/2011 at 3:19 pm: Jackson received, by wire, the Prepayment Premium on the 1997 Loan; and
> 2/16/2011 at 4:03 pm: PPM informed Carey Kramer not to mark the mortgages satisfied until Plaintiffs signed a release as to the 1997 Loan and until Plaintiffs acknowledged they had no dispute with the calculation of the Prepayment Premium for that loan.

(Doc. 27, 14) (emphasis in original) (internal citations omitted). Additionally, Jackson and

PPM argue that Mericle's claimed involuntariness is negated by the payment of Prepayment

Premiums on three occasions prior to 2011 that were calculated using the same formula

now at issue.[15] (Doc. 27, 13.)

Mericle's second basis for arguing that the voluntary payment doctrine should not

apply is that because the payment was made under protest, the right to later challenge the

calculations was reserved. (Doc. 25-1, 18.) It is undisputed that the payment was made

under protest. (Doc. 18, ¶ 57; Doc. 26, 57.)[16] The Pennsylvania Superior Court stated:

---

[15]

These Prepayment Premiums were paid in 2006, 2007, and 2008. (Doc. 27, 17.) Mericle contends these payments were made, despite believing they were calculated incorrectly "because the difference between the calculation proffered . . .and what Mericle viewed as the correct calculation was not, either literally or metaphorically, sufficient to make a federal case out of it." (Doc. 25-1, 10.)

[16]

Accompanying the Prepayment Premium was a letter dated February 16, 2011 sent by Lew Sebia, Chief Operating Officer of Mericle Commercial Real Estate Services(Doc. 21-28; Doc. 25-2, 29.) to Susan Lallo, a Carey Kramer employee, indicating that Mericle was not agreeing that the calculation was correct. The letter stated in relevant part:

> As you know, we are paying today the entire amounts required to satisfy each loan as set forth in your Paydown and Payoff Letters and require that you file the appropriate applicable Mortgage Releases/Satisfaction Pieces. Our payment of said amounts, however, shall not be construed that we are in agreement with your method of calculation of each applicable Prepayment Premium or that we agree with the amounts thereof. Accordingly, we reserve our right to review the calculation of the Prepayment Premium for each loan

> There must be compulsion, actual, present and potential, inducing the payment by force of conditions which render the person or property subject to the control of the party demanding payment, when the party so paying may give notice of the illegality of the demand, his involuntary payment and intention to reclaim. When the element of coercion is lacking, a mere protest or notice will not change the character of the payment or confer of itself a right to recover, although it may be necessary in some cases, where the element of coercion is present, to pay under protest, that is, with notice of an intention to reclaim, in order to repel the implication of an assent.

*Lowenstein v. Bache*, 41 Pa. Super. 552, 557 (1910) (citations omitted). Therefore, without duress or coercion, a reservation of the right to challenge the payment is without effect as there is nothing to challenge.[17] The only question is whether Mericle was acting under duress or compulsion, sufficient to make the payment involuntary.

Jackson and PPM rely on *Abrevaya*, 2009 WL 8466868 at *4, where the plaintiff's claim was barred by the voluntary payment doctrine because the plaintiff paid what was known to be an excessive payment to avoid the possibility of a negative credit rating, while also stating his inability to afford the costs of a legal action. *Id.* at * 4. The court held that the plaintiff could not "show that he acted under economic duress because he would have had a ready legal recourse at every stage of the process if he decided to fight [defendant]'s demand for payment", but instead chose to pay. *Id.*

---

following our analysis of the applicable prepayment premium calculation as included in the applicable loan documents and seek a refund of any overpayment thereof.
(Doc. 21-28; Doc. 25-2, 29.)

[17]

Mericle cites to 13 Pa. C.S. § 1207 to support the propriety of a purported reservation of the right to contest the prepayment calculation. Section 1308, which replaced Section 1207 in 2008, allows parties' continued performance under a contract despite a dispute when performance is tendered under protest. *See* 13 Pa. C.S. § 1308. Jackson and PPM argue that Mericle paid the Prepayment Premium to terminate the loan and not to facilitate a continuation of the parties' performance despite a dispute, therefore, the statute does not apply. (Doc. 27, 15.) (Doc. 27, 15. (citing *Occidental Chem. Corp. v. Envtl. Liners, Inc.*, 859 F. Supp. 791, 796 (E.D. Pa. 1994) (statute was intended to apply when performance is continuing, and not to the finalizing of a disputed debt through an accord and satisfaction.). As noted, the dispositive inquiry in this case is whether or not Mericle acted under duress sufficient to render any payment, whether made under protest or not, involuntary.

Jackson and PPM also cite to *Ochiuto v. Prudential Ins. Co. of Am.*, 356 Pa. 382, 52 A.2d 228 (1947). In *Ochiuto*, the court held that "in order to constitute duress there must be a threatened seizure of a person or his property for the purpose of compelling him to pay money *for which he is not liable;* moreover, the threat of issuing legal process to enforce a demand cannot, in any event, constitute duress because the threatened party is not being deprived of his day in court and the opportunity to be heard in opposition to the claim." 356 Pa. at 384, 52 A.2d at 230 (emphasis in original).

In opposition, Mericle relies on *Peterson v. Crown Financial Corp.*, 476 F. Supp. 1155 (E.D. Pa. 1979), aff'd, 661 F.2d 287 (3d Cir. 1981). In *Peterson,* the defendants demanded the payment of interest that was purportedly due on a note that had been previously marked cancelled, but, without payment, the defendants would withhold the stock pledged as collateral on a different loan until the demanded sums were paid. *Id*. at 1157. The plaintiff paid under protest and later sought to recover because, without the release of his stock, he could not consummate another agreement to sell the stock. *Id.* at 1158. The court held the plaintiff's payment was involuntary because he "was required to pay in order to free his collateral and consummate his sale . . .[and] [s]uch pressure [was] sufficiently coercive to constitute duress and require restitution of an undeserved benefit." *Id.* at 1161. The court also held that the amounts demanded were improperly demanded of the plaintiff. *Id.*

Mericle also cites to *United States v. Williams,* 514 U.S. 527, 115 S.Ct. 1611 (1995). A tax lien was levied against the plaintiff's property, unbeknownst to her, due to the actions of her ex-husband. 514 U.S. at 531, 115 S.Ct. at 1615. When the plaintiff sought to sell the property, she was informed of the lien. *Id.* Faced with a purchaser who threatened to sue if clean title was not presented, the plaintiff authorized that funds from the sale of the property be set aside to resolve the lien. *Id.* The Supreme Court held that 28 U.S.C. § 1346(a)(1)[18], which allows "one from whom taxes are erroneously or illegally collected to sue

---

[18]

**(a)** The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

for a refund of those taxes", permitted the plaintiff's suit.  514 U.S. at 536, 115 S.Ct. at 1618. The plaintiff "did not have time to bring a quiet title action [and] [s]he urgently sought to sell the property", while she alleged that the lien was attached to the wrong property, and, therefore, an improper lien. 514 U.S. at 536, 540, 115 S.Ct. at 1618, 1620.

Turning to the current case, the primary reason alleged by Mericle making the payment involuntary was that Jackson and PPM would not release the liens on the collateral properties unless the Prepayment Premiums were paid. Mericle contends that if the liens were not released, a multi-million dollar deal would be derailed.[19]

The discussions regarding the release of the liens is evidenced by an email chain attached to the filings. (*See* Doc. 25-5, 30-46.) Mr. Sebia, Mr. Sebia's assistant, and Ms. Lallo communicated via email regarding the Prepayment Premium on February 16, 2011. (*See* Doc 25-5, 31-34.) Karl Hildebrand, a Portfolio Manager in the Loan Servicing Department of PPM, was also involved in discussions with Ms. Lallo regarding the release of the liens. (*See* Doc 25-5, 38-42.) Mr. Hildeband purportedly indicated that the liens would not be released until Mericle "acknowledged they [sic] have no dispute with the prepayment premium calculation." (*Id.* at 18.)

Jackson and PPM argue that because the money was wired to PPM at 3:19 pm on February 16, 2011, and the evidence shows that Mr. Hildebrand did not state until 4:03 pm on February 16, 2011 that the liens would not be released,  Mericle cannot now contend that the payment of the Prepayment Premium was motivated by that statement. (Doc. 27, 14

---

**(1)** Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws
28 U.S.C.A. § 1346.

[19]

Moreover, the mortgages would not be satisfied and the liens would not be released unless and until Mericle acknowledged agreement with the Prepayment Premiums (thereby obviating the protect) and provided a signed release.

(citing Doc. 25-5, 27-38.)) However, contained within the same email chain is an email sent at 2:56 pm on February 16, 2011, by Ms. Lallo to Mr. Sebia's assistant. (Doc. 25-5, 40-41.) Ms. Lallo states the following:

> Hi Karen-Just a few questions/comments:
>
> •  Lew's letter only refers to two Berkadia Loans. Is Berkadia Loan No. 400034934 not paying off today?
>
> •  Per the payoff letters provided, the borrower is to provide CKPP [Carey Kramer] with the release documentation, which we will send to the lender for execution, after which we will return it to the borrower or their representative for filing. Instructions for the applicable signature block were contained in the payoff letters.
>
> •  If the borrower is going to dispute the Berkadia prepayment calculations, then they must resubmit the request for a payoff statement, identifying the difference in interpretation and or concerns regarding the Payoff Instruction Letter. Berkadia will take the dispute under advisement and it will be reviewed by management. I will need to contact PPM concerning their procedures for a dispute of a prepayment premium calculation. All disputes will need to be addressed prior to payoff.
>
> •  If you have any questions concerning this matter, please do not hesitate to contact me at (610) 341-0578. Susan

(*Id.*) Mr. Sebia's assistant forwarded the email to Mr. Sebia at 3:01 pm. (*Id.* at 40.)

In response, Mr. Sebia sent Ms. Lallo an email at 3:35 pm on February 16, 2011, that stated in relevant part, "we cannot hold up our closing to our pay-offs (which have already been sent to you in the exact amounts that the lenders have calculated) until you 'take the dispute under advisement' and have it 'reviewed by management' as you state in your email to me." (Doc. 25-5, 39.)

Much like the plaintiff in *Peterson*, Mericle contends that the payments were involuntarily made to allow a pending deal to go forward. It also remains to be decided whether the amount demanded as the Prepayment Premium was the correct amount based on the ambiguity in the parties' agreement. Therefore, a question of material fact exists as to whether or not Mericle acted voluntarily when the payments were made. Mr. Sebia's statement to Ms. Lallo in response to her email (arriving before the money was wired) demonstrates that Mericle may not have believed it had any other choice but to pay the

demanded sums so as to not derail the ongoing transaction and there is no evidence of record that Mericle had other potential avenues for recourse at the time. Accordingly, there is a question of material fact regarding whether the payments were in fact made voluntarily on the 1997 Loan. Jackson and PPM's motion for summary judgment on Mericle's breach of the contract claim will be denied with respect to the 1997 Loan.

### B.    Breach of Implied Covenant of Good Faith and Fair Dealing

Mericle alleges Jackson and PPM "breached their duty of good faith and fair dealing by calculating and demanding an improper and excessive Prepayment Premium." (*Compl.* at ¶ 47.) Mericle further alleges that "Jackson and PPM, by their own actions and through the actions of their agents and/or representatives, breached their duty of good faith and fair dealing . . . by demanding a release prior to releasing and/or marking their mortgages as satisfied." (*Id.* at ¶¶ 47-48.)

"[U]nder Pennsylvania law, a 'claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc.,* 951 A.2d 384, 392 (Pa.Super.Ct.2008)). "Courts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) (citing *Duquesne*, 66 F.3d at 617–18; *USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433, 438 (3d Cir.1993)). Therefore, "a plaintiff must allege facts to establish that a contract exists or existed, including its essential terms, that defendant failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract other than the covenant of good faith and fair dealing, and that resultant damages were incurred by plaintiff." *Burton*, 707 F.3d at 432  (citing *In re 400 Walnut Associates, L.P.*, 454 B.R. 60, 73 (Bankr. E.D. Pa. 2011); *CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.,* 645 F.Supp.2d 354, 369 (E.D.Pa.2009); *Sheinman Provisions, Inc. v. Nat'l Deli LLC,* 2008 U.S. Dist. LEXIS 54357, at *3, 2008 WL 2758029, *3 (E.D.Pa.

July 15, 2008)).

With regard to the alleged excessive Prepayment Premium calculation, Mericle's claims for breach of the implied covenant of good faith and fair dealing under the 1996 Loan are without merit as there was no contract between the parties when the Prepayment Premiums were paid. *See* Section A.1. *supra.*

Turning to the 1997 Loan, Mericle contends it is "entitled to argue that Jackson National and PPM acted in bad faith when they calculated the prepayment premiums . . ." (Doc. 25-1, 21.)  Mericle relies on *Jackson v. Wells Fargo Bank, N.A.,* 2013 WL 5945732, at *14 (W.D. Pa. Nov. 6, 2013) and the Restatement (Third) of Property (Mortgages) § 6.2[20] and argues that "the covenant of good faith and fair dealing is explicitly recognized as a limit on prepayment premiums." (*Id.*) In *Jackson*, the plaintiffs were permitted to "utilize the covenant [of good faith and fair dealing] to advance and prove" their breach of contract claim based on an allegation that the lender's exercise of discretion under the agreement was improper because the lender purportedly charged excessive fees that resulted in the receipt of kickbacks by either the lender or an affiliated third party. 2013 WL 5945732 at *14-15. Similarly, because Mericle's breach of contract claim regarding the 1997 Loan

---

[20]

> (a) Subject to the general requirement of good faith and fair dealing (Restatement, Second, Contracts § 205), the power of courts to refuse enforcement of unconscionable contract terms (Restatement, Second, Contracts § 208), and other applicable law,(i) an agreement that prohibits payment of the mortgage obligation prior to maturity is enforceable; and(ii) except as provided in § 6.3, an agreement requiring the mortgagor to pay a fee or charge as a condition of such payment is enforceable.(b) Notwithstanding an agreement of the type described in (a), the mortgagor has a right to the release of the mortgage on the real estate, provided that the mortgagor gives substitute security, equal in value to the mortgage obligation and any associated fees, that is substantially the equivalent of cash. The mortgagor must pay all costs associated with the substitution. The parties may agree that security other than the substantial equivalent of cash may be substituted, but may not agree to deny to the mortgagor the right of substitution.

Restatement (Third) of Property (Mortgages) § 6.2 (1997).

remains, it should be entitled to argue that Jackson and PPM breached the implied covenant of good faith and fair dealing with regard to the calculation of the Prepayment Premium on the 1997 Loan.

Mericle also alleges that Jackson and PPM "refused to release their liens unless [the Prepayment Premiums] were paid," therefore, violating the implied covenant of good faith and fair dealing. (Doc. 25-1, 21.) However, Mericle admits "that the mortgaged properties servicing [sic] as collateral for the 1996 Loan and the 1997 Loan were marked satisfied in compliance with Pennsylvania law, and in any event, within seven days of Plaintiffs['] complete repayment of the loans." (Doc. 18, ¶ 60.) Mericle has not pointed to any provision in the parties' agreements that required Jackson or PPM to mark the mortgages satisfied immediately and as stated by Jackson and PPM, Pennsylvania law provides that, upon request, a mortgage must be marked satisfied within forty-five days of the request. (Doc. 27, 19 n. 6 (citing *O'Donoghue v. Laurel Sav. Ass'n*, 556 Pa. 349, 355, 728 A.2d 914, 917 (1999).)  Mericle has also not alleged damages due to any refusal to mark the mortgages satisfied. Therefore, with regard to the release of liens, there can be no claim for the breach of the implied covenant of good faith and fair dealing without an allegation that the contract was breached when the liens were not immediately released and with no alleged damages. *See*  Restatement (Second) of Contracts § 205 (1981)("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.") Mericle will not be permitted to argue a breach of the implied covenant of good faith and fair dealing based on any purported delay in marking the mortgages satisfied because the claim is not based on the parties' written agreement.

### C.   Unjust Enrichment

Jackson and PPM contend that unjust enrichment claims arising from a contract are not cognizable under Pennsylvania Law. Mericle counters that Jackson and PPM demanded and were paid an amount that overcompensated Jackson National and/or PPM and put "Jackson National and PPM in a better position than that which they would have occupied absent Mericle's prepayment of the Loans." (*Compl.* at  ¶¶ 51-52.) Further, Mericle alleges

31

it would be unjust for Jackson and PPM to retain the amount that exceeds that which was owed by Mericle and it should have to disgorge the "portion that represents interest paid on amounts that would have amortized had Mericle paid the loans over time as and when due." (*Id.* at ¶¶ 53-54.)

In response to the motion for summary judgment Mericle argues that "Jackson National and PPM . . . obtained the [Prepayment Premium] by refusing to release their liens–liens that existed independently of the loan agreements." (Doc. 25-1, 21.)

Pennsylvania law sets forth the elements of a claim for unjust enrichment as follows: "(1) the plaintiff conferred a benefit upon the defendant; (2) an appreciation of such benefits by the defendant; and (3) the defendant accepted and retained such benefit under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value." *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 780 (M.D. Pa. 2008) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 447 (3d Cir.2000)). However, "unjust enrichment is a quasi-contractual doctrine and is inapplicable if the parties' relationship "is founded on a written agreement or express contract." *Cunningham v. M & T Bank Corp.*, No. 1:12-CV-1238, 2013 WL 5876337, at *7 (M.D. Pa. Oct. 30, 2013) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987) (citations omitted)).

Mericle's attempts to argue that the Prepayment Premiums were only paid because of the purported refusal to release the liens does not provide an avenue for recovery under Pennsylvania law. Mericle's claims are based on whether or not the Prepayment Premium demanded, and paid by Mericle, was in excess of what was allowed under the parties' written agreement. The parties' relationship is expressly based on a written agreement and Mericle has not alleged that the 1997 Loan was an unenforceable contract and cannot now contend that the payment was based on a matter outside of the written agreement when the asserted basis for liability was a breach of contractual language. Additionally, although the parties fail to specifically address the issue of whether or not PPM was a party to the loans, there has not been a specific allegation that PPM received any benefit from Mericle. Simply

speculating that PPM may have retained some of the Prepayment Premium (*See* Doc. 25-1, 20.), is insufficient to demonstrate that there is a genuine issue of material fact with regard to Mericle's unjust enrichment claim.

Mericle fails to state a cognizable unjust enrichment claim and Jackson and PPM's motion for summary judgment on Mericle's unjust enrichment claim will be granted.

### D.    Negligent Misrepresentation

Jackson and PPM contend that negligent misrepresentation claims are also not cognizable under Pennsylvania Law. (Doc. 17, 27-29.)  In its opposition, Mericle concedes that the negligent misrepresentation claim is time-barred and therefore seeks to withdraw the claim. (Doc. 25-1, 2 n. 1.) Jackson and PPM's motion for summary judgment will be granted and I will not further address this claim.

### III. Conclusion

For the above stated reasons, Jackson and PPM's motion for summary judgment will be granted in part and denied in part.

An appropriate order follows.


 June 27, 2016                                           /s/ A. Richard Caputo
Date                                                      A. Richard Caputo
                                                         United States District Judge

33